FILED by _____ D.C.

**Mar 28, 2017**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
## 17-20235-CR-MOORE/MCALILEY
### CASE NO. _____

18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1348
15 U.S.C. § 78m(b)(2),(5)
15 U.S.C. § 78ff(a)
17 C.F.R. § 240.13b2-2
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA,

     v.

HYUNJIN LERNER,

     Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

### The Defendant and Relevant Entities

1.     Bankrate, Inc. ("Bankrate") was a marketing and financial publishing company. Bankrate aggregated and published information related to various consumer financial products, including mortgages, credit cards, insurance, and automobile loans.

2.     Bankrate owned and operated a number of websites that allowed potential customers to compare and shop for different financial products.  When a potential customer used one of Bankrate's websites and showed interest in a particular financial product, Bankrate passed the customer's information along to the bank or financial services company that was offering the

product.  In exchange for providing information about the potential customer to the company offering the financial product, Bankrate received a payment from the company.  Bankrate called the information it sold about the potential customer a "lead."  Bankrate sold mortgage leads to banks and mortgage originators; insurance leads to regional and national insurance companies; and credit card leads to various credit card originators.

3.      Bankrate also generated revenue by selling financial information, such as average mortgage rates, directly to newspapers or other publishers, and through advertising on its websites.

4.      Bankrate's principal offices were in North Palm Beach, Florida.  Bankrate also maintained offices in New York, Denver, Colorado, and Austin, Texas.  Bankrate employed approximately 450 people who worked in three primary divisions: (1) a mortgage information business, referred to internally as "Bankrate Core"; (2) "Bankrate Insurance," an insurance information business; and (3) "Bankrate Credit Cards," a credit card information business. Bankrate's offices in Florida focused on the mortgage information business.

5.      Starting in or around June 2011, Bankrate's stock was traded publicly on NASDAQ, a national securities exchange, and was registered with the United States Securities and Exchange Commission ("SEC"), an agency of the United States, pursuant to Section 12(b) of the Securities Exchange Act of 1934.  Bankrate's stock traded on NASDAQ under the ticker symbol "RATE."  Bankrate reported that it earned approximately $424 million in total revenue in 2011, and approximately $457 million in total revenue in 2012.  During the same period, Bankrate's shares had a market capitalization value of approximately $1 billion.

6.      From in or around September 2006 to in or around September 2014, the defendant **HYUNJIN LERNER** served as Bankrate's Vice President of Finance.  As Vice President of Finance, **LERNER** reported directly to Bankrate's Chief Financial Officer ("CFO"), and

supervised other employees in the finance department.  **LERNER** was also a certified public accountant ("CPA").

## Bankrate's Financial Regulators and Auditors

### The Securities and Exchange Commission

7.     The SEC was an independent agency of the United States government charged by law with preserving honest and efficient markets in securities. The federal securities laws, regulations, and rules were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public.

8.     As a public company, Bankrate and its directors, officers, and employees were required to comply with the federal securities laws, regulations, and rules, and to make and keep books, records, and accounts, which in reasonable detail, accurately and fairly reflected the revenue collected and expenses incurred by Bankrate.

9.     Bankrate was also required to file annual reports ("SEC Forms 10-K") and quarterly reports ("SEC Forms 10-Q") with the SEC that contained audited financial statements that accurately and fairly presented the financial condition of Bankrate, as well as other reports that contained information about Bankrate's management, Board of Directors, business operations, and performance.  Through these reports, Bankrate disclosed its financial information to the SEC, Bankrate's shareholders, and the investing public.

10.     Bankrate also disclosed its financial information to its shareholders and the investing public through other means, including through press releases, shareholder meetings, earnings calls, and earnings announcements.

11.     Securities laws, as well as the SEC's regulations and rules for public companies, required that Bankrate, among other things, make and keep books, records, and accounts that

accurately and fairly reflected the transactions and disposition of the company's assets and prohibited the knowing falsification of Bankrate's books, records, or accounts.

Bankrate's Auditors

12.     An auditor is an independent certified public accountant who examines the financial statements that a company's management has prepared.  Federal securities laws, regulations, and rules required that an independent auditor examine and report on the financial information that Bankrate provided to the SEC and the investing public.

13.     From in or around 2011 and continuing through 2014, a known public accounting firm ("Accounting Firm A") with offices in Miami, Ft. Lauderdale, and elsewhere, acted as the independent auditor of Bankrate's financial statements.   Accounting Firm A relied on **LERNER** and other Bankrate employees in the finance department to provide truthful and accurate information about Bankrate's internal accounting practices and policies.  Accounting Firm A obtained information from **LERNER** and other Bankrate employees through phone calls, meetings, and questions submitted via electronic mail.  In addition, **LERNER** provided written assurances and representations to Accounting Firm A that, among other things, **LERNER** was not aware "of any information indicating that an illegal act, or violations or possible violations of any regulations, ha[d] or may have occurred, whether or not perceived to have a material effect on the interim financial statements," and that **LERNER** had "no knowledge of fraud or suspected fraud affecting the Company involving… Management."

14.     Based in part on these written representations from **LERNER** and other Bankrate employees, Accounting Firm A would also offer an opinion as to whether Bankrate's annual financial statements fairly presented, in all material respects, Bankrate's financial position.

Accounting Firm A's opinion was filed contemporaneously with Bankrate's annual report to the SEC and was publicly available to investors and the investing public.

### Bankrate Publicized "Adjusted EPS" and "Adjusted EBITDA" Metrics

15.     In addition to quarterly and annual reports that contained, among other things, Bankrate's purported revenue, earnings per share ("EPS"), and earnings before interest, taxes, depreciation, amortization ("EBITDA"), Bankrate also provided investors with "adjusted" earnings calculations which were purportedly adjusted to exclude only certain identified expenses, gains and losses.

16.     Bankrate would claim publicly that when the company reported "Adjusted EPS" and "Adjusted EBITDA" figures, it meant that Bankrate had adjusted these earnings metrics to only exclude "stock based compensation expense, offering and deal related expenses and amortization expense."

17.     In addition to including adjusted earnings figures in Bankrate's quarterly and annual financial reports, Bankrate also published adjusted earnings figures in regular press releases, and Bankrate's management discussed adjusted earnings figures in calls with analysts and investors.  In Bankrate's press releases, Bankrate would describe the adjusted earnings metrics, including Adjusted EPS and Adjusted EBITDA, as having been provided, in part, "to enhance investors' overall understanding of Bankrate's current financial performance and its prospects for the future."

### Bankrate's Expense Accruals

18.     Under the relevant accounting rules, on a quarterly and yearly basis, Bankrate was required to make a good faith estimate of the costs to Bankrate associated with certain expenses, such as legal and accounting fees, and then reduce Bankrate's earnings by the amount of that

estimate.  At Bankrate, the amount of this estimate was referred to as an "expense accrual."  Any increase in Bankrate's expense accruals caused a decrease in earnings.  Conversely, any decrease in Bankrate's expense accruals caused an increase in earnings.   **LERNER** and other Bankrate employees in the finance department had the responsibility to decide when and whether to increase or decrease Bankrate's expense accruals.  Bankrate was required to provide its quarterly and annual expense accrual calculations to Accounting Firm A.

**COUNT 1**
**Conspiracy to Commit Wire Fraud**
**Falsify Books, Records, and Accounts of a Public Company, and**
**Make False Statements to a Public Company's Accountants**
**(18 U.S.C. § 371)**

1.      The General Allegations section of this Indictment is realleged and incorporated by reference as though fully set forth herein.

2.      From in or around at least 2011, through in or around at least September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere,  the defendant,

**HYUNJIN LERNER**,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with other individuals known and unknown, to commit certain offenses against the United States, namely:

a.       to knowingly and willfully, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings,

signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343;

        b.     to knowingly and willfully falsify, and cause to be falsified, books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Bankrate, in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff; and

        c.     to knowingly and willfully, directly or indirectly: (a) make or cause to be made materially false or misleading statements to Accounting Firm A, or omit to state, or cause another person to omit to state, any material fact to Accounting Firm A necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading; or (b) take action to coerce, manipulate, mislead, or fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Bankrate's financial statements materially misleading, in connection with Accounting Firm A's review of Bankrate's financial statements and preparation of Bankrate's quarterly and annual reports required to be filed with the SEC, in violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulation, Section 240.13b2-2(a) and 240.13b2-2(b).

## PURPOSE OF THE CONSPIRACY

     3.     The purpose of the conspiracy was for **LERNER** and his co-conspirators to mislead Bankrate's shareholders, regulators, independent auditors, and the investing public in order to: (a) maintain and increase the market price of Bankrate's stock; and (b) unjustly enrich **LERNER** and his co-conspirators through the continued receipt of compensation, stock and other benefits.

## MANNERS AND MEANS OF THE CONSPIRACY

### Overview of the Conspiracy

4.      From in or around at least 2011, through in or around at least September 2014, **LERNER** and others agreed to (a) defraud Bankrate's shareholders and the investing public, and (b) mislead Bankrate's independent auditors and regulators, by making and causing others to make false and misleading statements about Bankrate's financial condition.

### Manipulation of Bankrate's Expense Accruals

5.      **LERNER** and his co-conspirators maintained a spreadsheet that documented and tracked unnecessary and unsupported expense accruals, which they used to manipulate Bankrate's financial statements.  The spreadsheet – which **LERNER** and his co-conspirators referred to as "cushion" – contained hundreds of thousands of dollars of purported expense accruals for which there was no justification or support.  Rather than reduce Bankrate's improperly recorded expense accruals immediately, **LERNER** and his co-conspirators would selectively reverse hundreds of thousands of dollars in expense accruals in later quarters as a means of controlling and inflating Bankrate's earnings and financial performance.

6.      For example, in or around April 2012, while Bankrate was preparing its quarterly financial statements, one of **LERNER's** co-conspirators told **LERNER** via an interstate wire that he "need[ed] all the accrual overage" because he "need[ed] to tune the numbers up closer to $38 [million in reported earnings]."  **LERNER** responded that "we have $1.7 [million]," meaning that there was $1.7 million in "cushion" available to reverse and inflate Bankrate's earnings. Approximately two hours later, **LERNER** instructed another Bankrate employee in the accounting department to reverse approximately $500,000 of the $1.7 million in available "cushion."

7.      In addition, in order to manage and build the "cushion" spreadsheet and ensure that expense accruals were available to inflate Bankrate's earnings in later quarters, **LERNER** and his co-conspirators would also not reduce expense accruals even when they knew the accrual was unnecessary and unsupported.  For example, in or around January 2012, **LERNER** was notified that Bankrate had received an invoice for approximately $135,000 in legal expenses from a law firm.  **LERNER** asked another Bankrate employee how much had been accrued for the expense, and the employee responded to **LERNER** that Bankrate had accrued $253,000.  Rather than updating Bankrate's financial statements based on the actual invoice they had received, **LERNER** instead told the Bankrate employee "Cool…we are not reversing the accrual."  **LERNER** gave this direction in order to improperly build the "cushion" and save the unnecessary and unsupported accrual to inflate earnings in later quarters.

8.      Similarly, in or around January 2012, **LERNER** and one of his co-conspirators received an analysis indicating that Bankrate needed to reverse approximately $1.5 million in expense accruals.  Instead, **LERNER** and one of his co-conspirators directed other Bankrate employees in the finance department to only reverse approximately $800,000 in accruals, meaning that approximately $700,000 in unnecessary and unsupported accruals were saved as "cushion" for use in inflating earnings in later quarters.

<u>Manipulation of Bankrate's Publicly Reported Adjusted Earnings</u>

9.      As described above, Bankrate represented to the investing public that when it reported Adjusted EBIDTA and Adjusted EPS, these figures were only adjusted by excluding certain expenses, which Bankrate identified as "stock based compensation expense, offering and deal related expenses and amortization expense."  However, in contrast to what Bankrate was reporting publicly, **LERNER** and his co-conspirators manipulated Bankrate's Adjusted EPS and

Adjusted EBITDA figures by directing Bankrate's finance department to improperly book routine fees and expenses as "deal related expenses" or "deal costs."  By intentionally adding routine expenses to the "deal costs" account, **LERNER** and his co-conspirators caused more expenses to be excluded from Bankrate's publicly reported adjusted earnings figures than was disclosed to investors, and caused Bankrate's publicly reported Adjusted EPS and Adjusted to be fraudulently inflated.

10.    For example, in or around March 2012, LERNER and his co-conspirators received an invoice from Accounting Firm A for approximately $400,000 in routine audit fees.  Upon receipt of the invoice from Accounting Firm A, one of **LERNER's** co-conspirators instructed **LERNER** to improperly book the entire amount of the invoice to Bankrate's "deal costs" account. **LERNER's** co-conspirator further instructed **LERNER** that he did not care if Accounting Firm A discovered the improper entry and "complain[ed]," because they could justify the entry later by falsely claiming "it was a mistake."

11.    Similarly, in or around March 2012, a Bankrate employee asked **LERNER** where to book expenses for routine work performed by Accounting Firm B.  **LERNER** responded that, for the entirety of 2011, one of his co-conspirators had instructed him to improperly book all of Accounting Firm B's expenses—including the expenses related to Bankrate's routine annual financial reporting requirements—to Bankrate's "deal costs" account.  **LERNER** further described the direction he received from his co-conspirator to book all of Accounting Firm B's fees to Bankrate's "deal costs" account as "Another [first name of co-conspirator] Special."

<u>Manipulation of Bankrate's Financial Statements Through Improper Expense and Revenue</u>
<u>Adjustments</u>

12.     Throughout 2011 and 2012, **LERNER** and his co-conspirators manipulated Bankrate's financial statements by making a series of false and misleading entries and adjustments to Bankrate's revenue and expense accounts.  Often these entries were made by **LERNER** and his co-conspirators as Bankrate was in the midst of preparing its quarterly financial statements, and for the purpose of hitting a revenue or earnings target.

13.     For example, in or around July 2011 in the midst of preparing Bankrate's second quarter financial statements, one of **LERNER's** co-conspirators stated that he "may want to tune our numbers to $30 [million] even ebitda."  **LERNER** responded that it was "no problem getting to $30 million," and suggested that they reduce a previously booked expense by $150,000 "to get there." **LERNER's** co-conspirator responded to **LERNER** "Ok go ahead – make it just over $30 [million]."

14.     Similarly, in or around June 2012, one of **LERNER's** co-conspirators told **LERNER** to make an improper and unsupported adjustment to a financial report that was being prepared for Bankrate's Board of Directors, and to "keep it under the radar please."  **LERNER** responded by agreeing to make the adjustment.

15.     As another example, in or around July 2012 during the preparation of the quarterly financial statements, one of **LERNER's** co-conspirators told **LERNER** "[w]e have to get to 14 in ebitda for June $37 for the quarter."  **LERNER** responded by instructing other Bankrate employees to reverse $180,000 in previously booked expenses without any justification or support.

16.     In addition, in or around July 2012, after reviewing Bankrate's quarterly financial results, **LERNER** and his co-conspirators improperly booked hundreds of thousands of dollars in revenue without any justification or support.  Thereafter, on or about July 31, 2012, Bankrate

reported its Adjusted EBIDTA for the quarter as $37.5 million and Adjusted EPS of $0.18, surpassing many analysts' forecasts for the quarter.

Concealing False and Misleading Entries from Accounting Firm A

17.     **LERNER** and his co-conspirators concealed the false and misleading entries they had made and caused to be made from Accounting Firm A and others.

18.     For example, in or around February 2011, **LERNER** sent an email to two of his co-conspirators with the subject "First cushion found by [Accounting Firm A]."  In the email, **LERNER** indicated that he had explained falsely the "cushion" to Accounting Firm A as being supported by expected legal fees for which Bankrate had yet to receive a bill.  Starting in or around 2011, later versions of the "cushion" spreadsheet sent and received by **LERNER** and his co-conspirators contained an additional column titled "[Accounting Firm A] Identified," which **LERNER** and his co-conspirators used to keep track of "cushion" that had been discovered by Accounting Firm A.

19.     In or around March 2011, after **LERNER** sent one of his co-conspirators a version of the "cushion" spreadsheet, **LERNER's** co-conspirator told **LERNER** that he was concerned that some of the comments in a version of the spreadsheet might alert Accounting Firm A that the expense accruals were unsupported, and chastised **LERNER** that "[p]eople really have to start using their brains, sometimes I really wonder.  OK why not just write 'Hey [Accounting Firm A] – this entry is cushion, please propose an adjusting entry,'" and that he "really expect[ed] this stuff to be managed better."  **LERNER** responded by assuring his co-conspirator that the "schedule was never shared with [Accounting Firm A]" and that it was "purely an internal document."

20.     As described above, in or around January 2012, **LERNER** and one of his co-conspirators received a spreadsheet indicating that Bankrate needed to reverse approximately $1.5

million in unsupported expense accruals.   Before sending the spreadsheet to Accounting Firm A, **LERNER** removed from the spreadsheet entries totaling $700,000, thereby concealing the $700,000 in "cushion" from Accounting Firm A so it would be available for use in later quarters. Instead, **LERNER** sent a version of the spreadsheet to Accounting Firm A which made it appear that there were only $800,000 in expense accruals that had been found and reversed. Approximately one week later, **LERNER** sent a Bankrate employee in the finance department an email with the subject "[first name of co-conspirator]'s Cushion – Save this Email – Don't Share this with Anyone," and attaching a spreadsheet itemizing the $700,000 in "cushion" that had been concealed from Accounting Firm A.

21.     In or around July 2012, after reviewing Bankrate's quarterly financial results, Accounting Firm A questioned one of the entries by which **LERNER** and his co-conspirators had improperly booked hundreds of thousands of dollars in revenue without any justification or support.  Before responding to Accounting Firm A, **LERNER** and another Bankrate employee discussed that they needed to "start figuring out an explanation for these."  Thereafter, **LERNER** created a new explanation for the questioned entry, and sent the explanation to Accounting Firm A.  After **LERNER** sent the explanation to Accounting Firm A, **LERNER** was informed by two Bankrate employees that the explanation could not justify the entry.   **LERNER** did not disclose this information to Accounting Firm A, or retract his prior justification.

<u>Lerner Sold His Bankrate Stock after Participating in the Manipulation of Bankrate's Financial Statements</u>

22.     On or about August 6, 2012, **LERNER** sold approximately 1,103 long shares and exercised 8,125 options of Bankrate stock, realizing gross proceeds of approximately $167,000.

## OVERT ACTS

23.     In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, the following overt acts, among others:

24.     On or about July 18, 2011, **LERNER** directed another Bankrate employee to improperly reduce Bankrate's expenses by $150,000.

25.     On or about January 25, 2012, **LERNER** directed another Bankrate employee not to reduce an unnecessary and unsupported expense accrual in order to save the accrual for use as a "cushion" to inflate Bankrate's earnings in later periods.

26.     On or about January 26, 2012, **LERNER** received an email showing that Bankrate had approximately $1.5 million in unnecessary and unsupported expense accruals.   On the following day, **LERNER** directed Bankrate employees to only reverse approximately $800,000 of the accruals, so that $700,000 would remain for use as "cushion" to inflate Bankrate's earnings in later periods.

27.     On or about January 27, 2012, **LERNER** agreed with one of his co-conspirators to try and delay Bankrate's expected receipt of an invoice from a law firm in order to maintain over $100,000 of "cushion" that could be used to inflate Bankrate's earnings in later periods.

28.     On or about February 6, 2012, **LERNER** sent a Bankrate employee in the finance department an email with the subject "[first name of co-conspirator]'s Cushion – Save this Email – Don't Share this with Anyone," and attaching a spreadsheet itemizing $700,000 in "cushion."

29,     On or about March 9, 2012, LERNER agreed with one of his co-conspirators to falsely and fraudulently book Accounting Firm A's routine audit fees to Bankrate's "deal costs" account.

30.     On or about April 9, 2012, one of **LERNER's** co-conspirators directed **LERNER** and other Bankrate employees to improperly book various routine expenses as "deal costs," including $40,000 of expenses charged by Accounting Firm B.

31.     On or about July 6, 2012, **LERNER** discussed with one of his co-conspirators a plan to reverse approximately $100,000 in previously booked expenses without any support or justification.

32.     On or about July 6, 2012, **LERNER** directed Bankrate employees via an interstate wire to reverse approximately $180,000 in previously booked expenses without any support or justification.

33.     On or about August 13, 2012, **LERNER** signed Bankrate's management representation letter to Accounting Firm A in which he falsely and fraudulently represented that **LERNER** had "made available [to Accounting Firm A] all…[f]inancial records and related data," that he was not aware "of any information indicating that an illegal act, or violations or possible violations of any regulations, ha[d] or may have occurred, whether or not perceived to have a material effect on the interim financial statements," and that he had "no knowledge of fraud or suspected fraud affecting the Company involving… Management."

34.     On or about November 14, 2012, **LERNER** signed Bankrate's management representation letter to Accounting Firm A in which **LERNER** falsely and fraudulently represented that he had "made available [to Accounting Firm A] all…[f]inancial records and related data," and that he had "no knowledge of fraud or suspected fraud affecting the Company involving… Management."

35.     On or about March 1, 2013, **LERNER** signed Bankrate's management representation letter to Accounting Firm A in which **LERNER** falsely represented that he had

"made available [to Accounting Firm A] all…[f]inancial records and related data," that "there [were] no…[v]iolations or possible violations of laws or regulations, whose effects should be considered for disclosure on the financial statements," and that he had "no knowledge of fraud or suspected fraud affecting the Company involving… Management."

36.     On or about March 1, 2013, **LERNER** and his co-conspirators caused Bankrate to file its Form 10-K for 2012, with the SEC.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 2-4
### Wire Fraud
### (18 U.S.C. § 1343)

1.     The General Allegations section and Paragraphs 5 through 36 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**HYUNJIN LERNER**,

did knowingly and with the intent to defraud, devise and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      The purpose of the scheme was for **LERNER** and his accomplices to mislead Bankrate's shareholders, regulators, independent auditors, and the investing public in order to: (a) maintain and increase the market price of Bankrate's stock; and (b) enrich **LERNER** and others through the continued receipt of compensation, stock and other benefits.

## THE SCHEME AND ARTIFICE

4.      Paragraphs 5 through 22 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

## USE OF THE WIRES

5.      On or about the dates specified as to each count below, ᴎYUNJIN LERNER, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as more particularly described below:

| Count | Approximate Date | Description of Interstate Wire Communication |
|---|---|---|
| 2 | May 1, 2012 | National press release announcing Bankrate's financial results for the first quarter of 2012 |
| 3 | July 6, 2012 | Email from **LERNER**, in Denver, to one or more Bankrate employees in Florida, discussing a fraudulent accounting entry |
| 4 | July 31, 2012 | National press release announcing Bankrate's financial results for the second quarter of 2012 |

In violation of Title 18, United States Code, Sections 1343 and 2.

### COUNT 5
### Securities Fraud
### (18 U.S.C. § 1348)

1.      The General Allegations section and Paragraphs 5 through 36 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From at least 2011, the exact date being unknown to the Grand Jury, through September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendant,

### HYUNJIN LERNER,

did knowingly and willfully execute a scheme and artifice (a) to defraud any person in connection with any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, and by statements containing material omissions, any money and property in connection with the purchase and sale of any security of Bankrate, an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78*l*), to wit, **LERNER** and others made, and caused to be made, false and misleading representations to Bankrate's shareholders and members of the investing public about Bankrate's true financial condition.

| Count | Approximate Date | Description of Event |
|---|---|---|
| 5 | March 1, 2013 | SEC Form 10-K for 2012. |

In violation of Title 18, United States Code, Sections 1348 and 2.

### COUNTS 6-9
### False Entries in a Public Company's Books, Records, and Accounts
### (15 U.S.C. §§ 78m(b)(5), 78m(b)(2), and 78ff(a))

1.      Paragraphs 1 through 18 of the General Allegations section and Paragraphs 5 through 36 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around June 2011, through in or around September 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendant,

**HYUNJIN LERNER**,

did knowingly and willfully falsify and cause to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of Bankrate, as more particularly described below:

| Count | Approximate Date | Description of Falsified Book, Record, or Account |
|-------|------------------|---------------------------------------------------|
| 6 | April 9, 2012 | Expenses booked to Bankrate's "deal costs" account |
| 7 | July 6, 2012 | Reversal of Bankrate's previously booked expense accrual |
| 8 | July 11, 2012 | Revenue booked to a customer in Bankrate's Insurance Division |
| 9 | July 12, 2012 | Revenue booked to a customer in Bankrate's Mortgage Division |

In violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff(a); and Title 18, United States Code, Section 2.

## COUNTS 10-12
### False Statements to Accountants
### (17 C.F.R. § 240.13b2-2 and 15 U.S.C. § 78ff(a))

1.     The General Allegations section and Paragraphs 5 through 36 of Count 1 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From at least in or around June 2011, through in or around March 2013, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida and elsewhere, the defendant,

**HYUNJIN LERNER**,

did knowingly and willfully, directly and indirectly (a) make and cause to be made materially false or misleading statements to Accounting Firm A, and omit to state, and cause another person to

19

omit to state, any material fact to Accounting Firm A necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading; and (b) take action to coerce, manipulate, mislead, and fraudulently influence Accounting Firm A knowing that such action, if successful, could result in rendering Bankrate's financial statements materially misleading, in connection with Accounting Firm A's review of Bankrate's financial statements and preparation of Bankrate's quarterly and annual reports required to be filed with the SEC, as more particularly described below:

| Count | Approximate Date | Description of False Entry or Statement |
|-------|------------------|-----------------------------------------|
| 10 | August 13, 2012 | Bankrate management representation letter signed by **LERNER** and sent to Accounting Firm A |
| 11 | November 14, 2012 | Bankrate management representation letter signed by **LERNER** and sent to Accounting Firm A |
| 12 | March 1, 2013 | Bankrate management representation letter signed by **LERNER** and sent to Accounting Firm A |

In violation of Title 15, United States Code, Section 78ff, and Title 17, Code of Federal Regulation, Sections 240.13b2-2(a) and 240.13b2-2(b); and Title 18, United States Code, Section 2.

## FORFEITURE
### (18 U.S.C. § 981(a)(1)(C))

1.      The allegations of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **HYUNJIN LERNER**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 371, and/or a violation of, or a conspiracy to violate, Title 18, United States Code, Sections including 1343, 1348, and, Title 15, United States Code, Section 78ff and, Title 17, Code of Federal Regulations, Part 240.13b2-2, as alleged in this Indictment, the defendant so convicted shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

Code, Section 2461, all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such violation.

### Substitute Assets Provision

3.      If any of the above described forfeitable property, as a result of any act or omission of the defendant:

        1)      cannot be located upon the exercise of due diligence;

        2)      has been transferred or sold to, or deposited with, a third party;

        3)      has been placed beyond the jurisdiction of the Court;

        4)      has been substantially diminished in value;

        5)      or has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the provisions of

Title 21, United States Code, Section 853, made applicable by Title 28, United States Code,

Section 2461(c).

A TRUE BILL

_____

FOREPERSON

_____

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

ANDREW WEISSMANN, CHIEF
FRAUD SECTION, CRIMINAL DIVISION

_____

HENRY P. VAN DYCK, ASSISTANT CHIEF
L. RUSH ATKINSON, TRIAL ATTORNEY
EMILY SCRUGGS, TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U. S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

HYUNJIN LERNER,

                                   Defendant.
_____/

**CASE NO.** _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

| | |
|---|---|
| __X__ Miami | _____ Key West |
| _____ FTL | _____ WPB        _____ FTP |

New Defendant(s)                     Yes _____   No _____
Number of New Defendants             _____
Total number of counts               _____

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:      (Yes or No)        __No__
    List language and/or dialect    _____

4.  This case will take ___15___ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)

| | | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | | Petty | _____ |
| II | 6 to 10 days | | | Minor | _____ |
| II | 11 to 20 days | __X__ | | Misdem. | |
| IV | 21 to 60 days | _____ | | Felony | __X__ |
| V: | 61 days and over | _____ | | | |

6.  Has this case been previously filed in this District Court?    (Yes or No)    __No__
    If yes:
    Judge: _____    Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?    (Yes or No)    __No__
    If yes:
    Magistrate Case No. _____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the _____   District of _____

    Is this a potential death penalty case? (Yes or No)    __No__

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003? _____ Yes    __X__ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007? _____ Yes    __X__ No

                                                    _____
                                                    HENRY P. VAN DYCK
                                                    DOJ ASSISTANT CHIEF
                                                    Court No. A5501507

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**    **HYUNJIN LERNER**

**Case No:** _____

Count #:   1

  18 U.S.C. § 371

  Conspiracy to Commit Wire Fraud, Falsify Books, Records, and Accounts of a Public

  Company, and Make False Statements to a Public Company's Accountants

**\*Max Penalty**:    Five (5) years' imprisonment

Counts #:   2 – 4

  18 U.S.C. § 1343

  Wire Fraud

**\*Max Penalty**:    Twenty (20) years' imprisonment as to each count

Count #:   5

  18 U.S.C. § 1348

  Securities Fraud

\*Max Penalty:    Twenty-five (25) years' imprisonment

Counts #:   6 – 9

  15 U.S.C. §§ 78m(b)(5), 78m(b)(2), and 78ff(a)

  False Entries in a Public Company's Books, Records and Accounts

\*Max Penalty:    Twenty (20) years' imprisonment as to each count

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**      **HYUNJIN LERNER**

**Case No:**

Counts #:    10 – 12

17 C.F.R. § 240.13b2-2

15 U.S.C. § 78ff(a)

False Statements to Accountants

\*Max Penalty:    Twenty (20) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**